1  Elliot J. Siegel (Bar No. 286798)
   elliot@kingsiegel.com
2  Julian Burns King (Bar No. 298617)
   julian@kingsiegel.com
3  Brent R. Boos (Bar No. 292808)
   brent@kingsiegel.com
4  **KING & SIEGEL LLP**
5  724 South Spring Street, Suite 201
   Los Angeles, California 90014
6  tel:   (213) 465-4802
   fax:  (213) 465-4803
7
8  Attorneys for Plaintiff and Putative Class

9                 **UNITED STATES DISTRICT COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11

12  **Li Pi,** individually and on behalf of all          CASE NO.
    similarly situated individuals,
13                                                         **CLASS ACTION COMPLAINT FOR:**
                        Plaintiff,
14                                                         1) **Violation of California's False**
         vs.                                                  **Advertising Law (Bus. & Prof.**
15                                                            **Code §§ 17500, et seq.);**
    **Embark Veterinary, Inc.**, a Delaware               2) **Violation of California's**
16  corporation; and **Does 1-10**, inclusive;               **Consumer Legal Remedies Act**
                                                              **(Cal. Civ. Code §§ 1750, et seq.);**
17                      Defendants.                           **and**
                                                           3) **Violation of California's Unfair**
18                                                            **Competition Law (Bus. & Prof.**
                                                              **Code §§ 17200, et seq.);**
19

20                                                         **Demand for Jury Trial**

21

22

23

24

25

26

27

28

Plaintiff Li Pi, by and through his counsel of record, brings this action on behalf of himself and all other similarly situated consumers who purchased qualifying products from Embark Veterinary Inc. and alleges as follows:

## INTRODUCTION

1. Advertised "reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product." *See* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald, *An investigation into the effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*, J. of Applied Bus. Research 6, no. 1, ), pp. 65-66 (1990); *see also* Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A 'Rule of Reason' Approach*, 70 J. Retailing 115, 118 (1994) ("reference to a retailer's normal or regular price in retail sale prices advertising provides the consumer with information used to determine perceived value").

2. For example, empirical research indicates that "[i]nflated reference prices can […] increase consumers' value perceptions […], reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products." Dhruv Grewal & Larry D. Compeau, *Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue*, J. Public Policy & Marketing 18, no. 1, p. 7 (1999).

3. In other words, by advertising discounts off higher reference prices, retailers can increase the perceived value of a product to consumers and decrease their desire to search for competing products, making them more likely to buy the retailer's discounted product

4. Further, by representing that discounts are temporary, retailers can increase a consumer's sense of urgency to buy the product now rather than later or risk losing the discount.

5. While offering legitimate discounts to achieve these results is a valid form of competition, offering fake ones—with made-up reference prices and/or with expiration dates—is deceptive, illegal, and harmful to consumers.

6. Indeed, research "suggest[s] that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price." *An investigation into the effects of Advertised Reference Prices on the Price Consumers are*

*Willing to Pay for the Product*, *supra*, at p. 66. One study showed that "on average, consumers were willing to pay $178.60 for the product with a $289 reference price" but "were willing to pay $250.80 for the identical product with a $429.00 reference price." *Id*.

7.      Thus, the temptation to advertise fake discounts is significant for retailers, whose profits can be increased by simply claiming their products regularly sell for more than they do.

8.      To combat such deceptive and unfair practices, California's False Advertising Law prohibits businesses from making statements that they know or should know to be untrue or misleading. Cal. Bus. & Prof. Code § 17500. This includes advertisements stating or suggesting that a product is discounted when, in fact, it is not.

9.      The FAL considers a sale to be "fake"—and illegal—when it continues for a period of more than 3 months, *i.e.*, a permanent sale. Cal. Bus. & Prof. Code § 17501 ("No price shall be advertised as a former price [. . .] unless the alleged former price was the prevailing market price [. . .] within three months next immediately preceding the publication of the advertisement.").

10.      Similarly, California's Consumer Legal Remedies Act prohibits "advertising goods or services with the intent not to sell them as advertised" and specifically prohibits "false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code § 1770(a)(9), (13).

11.      Fake or permanent discounts violate these laws. They are anti-consumer, anti-competitive, and must be stopped.

## **PARTIES**

12.      Plaintiff **Li Pi** is and was at all relevant times domiciled in Palo Alto, California.

13.      The proposed Class includes both current California residents and former residents who were domiciled in California when they purchased one or more qualifying products from Embark Veterinary, Inc. while being advertised with false discounts.

14.      Defendant **Embark Veterinary, Inc.** ("Embark") is a Delaware corporation with its principal place of business located at: 1 Lincoln Street, Floor 27, Boston, MA 02111. Embark is a canine genomics and biotechnology company. It primarily makes, markets, and sells a variety of dog DNA and health testing kits to dog owners, breeders, and veterinarians who make up

CLASS ACTION COMPLAINT

1    its consumer base.

2    　　15.    Plaintiff is not currently aware of the names and true identities of Does 1-10. Plain-

3    tiff reserves the right to amend this complaint to allege their true names and capacities when

4    this information becomes available. Each Doe defendant is responsible for the damages alleged

5    pursuant to each of the causes of action asserted, either through its own conduct or vicariously

6    through the conduct of others. All further references in this complaint to any of the named De-

7    fendants include the fictitiously named Doe defendants.

8    　　16.    At all times alleged herein, each Defendant was an agent, servant, joint employer,

9    employee, partner, and/or joint venture of every other Defendant and acted within the scope of

10   their relationship with the others. Moreover, the conduct of every Defendant was ratified by each

11   other Defendant.

12   **JURISDICTION AND VENUE**

13   　　17.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). The

14   amount in controversy exceeds $5,000,000, exclusive of interest and costs, and the matter is a

15   class action in which one or more members of the proposed Class are citizens of a state different

16   from that of Defendant.

17   　　18.    This Court has personal jurisdiction over Defendant. Defendant does business in

18   California. It advertises and sells its products in California to a market of consumers there. Due

19   to Defendant's actions, its products have been marketed and sold to consumers in California and

20   have harmed consumers in California. Plaintiff's claims likewise arose out of Defendant's con-

21   tacts with this forum. Due to Defendant's actions, Plaintiff purchased Defendant's product in

22   California and was harmed in California.

23   　　19.    Venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(d) because De-

24   fendant would be subject to personal jurisdiction in this District if this District were a separate

25   state. Defendant advertises and sells its products to consumers in this District, serves a market

26   for its products in this District, and Plaintiff's claims arose out of Defendant's contacts in this

27   forum. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events

28   giving rise to the claims occurred here.

CLASS ACTION COMPLAINT

**FACTUAL ALLEGATIONS**

***Embark Advertises False and Misleading "Discounts"***

20.    Defendant Embark Veterinary, Inc. ("Embark" or "Defendant") makes, markets, and sells a variety of dog DNA and health testing kits (the "Products") to consumers, who are largely comprised of dog owners, breeders, and veterinarians.[1]

21.    To that end, Defendant maintains a public website where it advertises its Products and their prices. Consumers can purchase the Products through an online store hosted on this website.[2]

22.    Like many businesses, Embark advertises "discounts" or "sales," during which the prices for its Products are purportedly discounted from higher, regular prices (i.e., "Reference Prices").

23.    However, Embark's "discount" and "sale" prices are illusory.

24.    At any given time, on its website, Defendant advertises significant discounts off the Reference Prices it provides for its Products. Defendant communicates this in at least three ways. Defendant starts by listing the purportedly discounted prices in bold next to struck-out Reference Prices on its Products listing webpage. Then, when customers place the Products in their online shopping carts, the purportedly discounted prices and struck-out Reference Prices are also listed there. Finally, Defendant lists and tallies up customers' supposed savings during the checkout process—e.g., "$30 OFF EACH KIT (-$30.00)," "$40 OFF EACH KIT (-$80.00)," and "TOTAL SAVINGS $110.00."

---

[1] The meaning of "Products" includes all versions of the Breed + Health DNA Test, Breed Identification Test, Dog Age Test, Gut Health Test, Oral Health Test, and all bundles including at least one of these products. It does not include the Large Embark Dog Bandanas, Embark eGift Cards, or dietary supplements also sold by Defendant.

[2] The Products are listed for sale on Defendant's website at https://shop.embarkvet.com/pages/shop-all, where the prices for those Products are *always* advertised as being discounted from higher regular or former prices (i.e., "Reference Prices").

1

25.    Example screen captures are provided below:

2

3



Screen captured on September 10, 2024.



Screen captured on September 10, 2024.

CLASS ACTION COMPLAINT

Screen captured on September 10, 2024.

26.    But Defendant's Products are *always* advertised with discounts off of higher Reference Prices, so consumers never actually pay the supposedly "regular" prices (i.e., Reference Prices) that the sale prices are purportedly discounted against. In other words, the "discounted" prices *are* Defendant's regular prices, and its Reference Prices are fictitious prices used solely to induce potential customers into purchasing its Products.[3]

27.    Defendant knows and counts on the fact that reasonable consumers interpret its advertisements to mean that it formerly charged the Reference Prices for its Products, and that they will get a discount off of those prices if they buy them now. Reasonable consumers also reasonably interpret these advertisements to mean that Defendant will, sometime soon, charge the Reference Prices again. But, in reality, consumers never pay these Reference Prices, so the discounts advertised by Defendant are illusory.

28.    To confirm that Embark always offers discounts off of its Reference Prices,

---

[3] This practice is known as false reference pricing. False reference pricing occurs when a seller advertises an artificial, inflated price for the sole purpose of enabling the subsequent offer of a large reduction from that price. In such cases, the 'reduced' price is, in reality, just the seller's regular price and the 'bargain' being advertised is a false one where the purchaser is not receiving the value he or she expects from the purchase.

CLASS ACTION COMPLAINT

1  Plaintiff's counsel investigated its advertising history using the Internet Archive's Wayback Ma-

2  chine (available at www.archive.org).⁴ That investigation confirms that, except for its Dog Age

3  Test, discounts off of the Reference Prices for Defendant's Products have persisted continuously

4  since at least October 12, 2022.

5      29.    For example, the Wayback Machine stores archived versions of Defendant's Prod-

6  ucts listing webpage (https://shop.embarkvet.com/pages/shop-all) from 55 different dates be-

7  tween October 12, 2022, and August 26, 2024. In 100% of these archived webpages, Defendant

8  listed its Breed + Health DNA Test as being marked down from $199, and its Breed Identification

9  DNA Test as being marked down from $129. However, across the same 55 archived webpages,

10  these Products were never listed for sale for more than $159 and $109, respectively. Thus, for

11  nearly *two years*, the Products were *never* actually sold at Defendant's Reference Prices. As a

12  result, customers never received the advertised discounts because the discounted price was the

13  regular price.

14      30.    Similarly, throughout the same period, Defendant's Gut Health Test and Oral

15  Health Test have also been continuously advertised as marked down from struck-out Reference

16  Prices but never actually listed for sale at those Reference Prices. Their prices are continuously

17  marked down from $125, but they have never actually been listed for sale for more than $115.

18      31.    Also, since at least May 14, 2024, Defendant's Dog Age Test has been continuously

19  advertised as marked down from $159 but never actually sold for more than $129.

20

21

22

23

24

25

26

27

28  ⁴ The Internet Archive, available at www.archive.org, is a library that archives web pages. *See* https://archive.org/about/

32.     Example screen captures are provided below:



  

  

Archived screen capture from October 12, 2022.

///
///
///
///
///
///
///
///
///
///
///

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16

17    Archived screen capture from September 18, 2023.

18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10

# Dog owner products

We want to change the way we care for our dogs —
to give them healthier, happier, and longer lives.



  

**Breed + Health DNA Test →**
$199 **$159**

Breed identification and relative finder, plus genetic health screening and insights tailored for mixed or purebred dogs.

**Breed Identification DNA Test →**
$129 **$109**

Decode your dog's unique breed mix and find relatives with the most accurate dog DNA test on the market. We test for over 350 breeds.

**Dog Age Test →**
$159 **$129**

Reveal your dog's age and birthday with the science of DNA methylation. Get lifestyle and care insights based on your dog's age.

Screen captured on September 28, 2024.

33.     Defendant also advertises and sells various Product bundles on its website. For each bundle, Defendant lists a "discounted" price in bold next to a struck-out Reference Price, then lists and highlights in yellow the total purported savings for purchasing said bundle. For example, at the time of filing this action, Defendant's "Breed + Health Test 2-pack" bundle was listed as being on sale for $298, with savings of $100. See below:



**Breed + Health Test 2-pack**
$398 **$298**  Save $100



Screen captured on September 28, 2024.

CLASS ACTION COMPLAINT

34.     However, the purported discount of "$100" in this example *includes* the illusory discounts from false Reference Prices discussed above, rendering the majority of the bundled savings illusory as well. For example, the real price for each Breed + Health DNA Test is $159 when purchased separately at Defendant's permanently discounted (i.e., regular) price, so buying two separately would cost $318. Thus, the actual discount provided when purchasing this bundle is only $20 ($318-$298)—*not* the $100 advertised by Defendant. The same is also true of Defendant's other Product bundles, but the amounts by which each bundle are purportedly discounted and actually discounted varies. See below:



Archived screen capture from September 29, 2024.

35.     Empirical research indicates that "[i]nflated reference prices can [...] increase consumers' value perceptions (transaction value and acquisition value), reduce their search

intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products." Dhruv Grewal & Larry D. Compeau, *Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue*, J. Public Policy & Marketing 18, no. 1, p. 7 (1999). These retailer-positive outcomes result from several distinct types of inferences consumers make about advertised reference prices. *See* Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A 'Rule of Reason' Approach*, 70 J. Retailing 115, 118-22 (1994).

36.     *First*, consumers infer that "the 'regular' price reflects the product's intrinsic value, and therefore is a fair price for the product." *Id*., at p. 119. "If the consumer wished to purchase a product of the quality indicated by the retailer's regular price, he or she might be induced to take advantage of the advertised savings to do so." *Id*.

37.     *Second*, consumers infer that "the retailer's 'regular' price reflects the prevailing competitive price and therefore is the market price of the product." *Id*. "Under the second inference, consumers may believe that rational retailers, aware of market conditions, set and adjust their regular prices so as to be competitive in that market." *Id*., at pp. 118-19. "The direct effect of this inference is to limit active consumer search for competitor price information." *Id*., at p. 119.

38.     *Third*, consumers infer that "the 'regular' price becomes the penalty price paid only by those unable to wait even the short time for the retailer's frequent sales events." *Id*., at p. 122. In other words, this inference creates a sense of urgency among consumers to buy now.

39.     In a study measuring the effects of false reference pricing on consumers' purchasing behavior, "[p]articipants were more likely to purchase an item when the selling price appeared discounted" from made-up original prices. Jennie Huang, *The Trill of the Deal: Quantifying the Price of Perceived Discounts and Mark-ups*, manuscript, p. 11 (2018). "Moreover, the larger the perceived discount, the higher the purchasing rate." *Id*.

40.     It was observed that a perceived discount of 10% led to a 3.8 percentage point increase in the purchasing rate, while a perceived discount of 20% led to a 6% increase, and a perceived discount of 40% led to a 10.7 percentage point increase. *Id*., pp. 11 & 38, Table A1.

41.     Using these same tactics, Embark leads reasonable consumers to believe that its struck-out Reference Prices are its regular prices (i.e., the prices at which its Products were recently offered for sale before the current "discounts" went into effect). In other words, reasonable consumers reasonably believe that Defendant's Reference Prices represent amounts that consumers normally must pay for Defendant's Products, did pay before its current "sale" began, and will pay again after the "sale" ends.

42.     Reasonable consumers also reasonably believe that Defendant's advertised Reference Prices represent the prevailing prices and true market values of its Products.

43.     Thus, reasonable consumers conclude that they are receiving discounts off of Defendant's regular prices in the amounts being advertised. Reasonable consumers then *buy* Defendant's products expecting to receive the benefit of their bargain—i.e., a discount in the *full* amount advertised—which they reasonably fear they will lose access to in a few days or weeks from the date of purchase.

44.     From time to time, Defendant advertises larger than normal discounts as part of a sale that is actually time-limited (e.g., a Black Friday Sale). However, during such sales, the prices for Defendant's Products are still advertised as being discounted from the same fake Reference Prices used before and after the sale, and which are never paid by customers, rather than the prices customers actually paid before and after the sale occurred.

45.     For example, on November 21, 2023, Defendant advertised its Breed + Health DNA Test as being sold for $127 next to a struck-out Reference Price of $199 and advertised its Breed ID DNA Test as being sold for $99 next to a struck-out Reference Price of $129. However, since at least October 12, 2022, these Products have never been listed for sale for more than $159 and $109, respectively. See below:

///
///
///
///
///



Archived screen capture from November 21, 2023.

46.     At the top of its webpage during this sale, Defendant also represented that consumers could "[s]ave up to $72 and get free shipping during our Black Friday Sale. Deal ends 11/26." But these representations were all false. The purported savings of $72 were based on the difference between the listed sale price for Defendant's Breed + Health DNA Test ($127) and its fake Reference Price ($199). In reality, the actual discount to Defendant's Breed + Health DNA Test attributable to this sale was $32 ($159 - $127). Further, Defendant seemingly *always* offers free shipping, so this benefit also was not attributable to its Black Friday Sale in 2023.

47.     However, this sale did not end on November 26, 2023, as advertised. On November 28, 2023, Defendant's website continued to offer the same sale but called it a Cyber Monday Sale instead: "Last chance to save up to $72 and get free shipping during our Cyber Monday Sale. Deal ends 11/28." See below:

///

///

///

///

1



2

3

4

5

6

7

8

9

10

11

12

13

14        Archived screen capture from November 28, 2023.

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

48.     Then, on November 29, 2023, Defendant's website simply stated: "Save up to $60 and get free shipping. Discount applied at checkout." See below:



Archived screen capture from November 29, 2023.

49.     These representations—sometimes explicit and sometimes implicit—that Embark offered time-limited discounts off of higher, regular prices, were false. In truth, Embark always offers discounts off of its advertised Reference Prices. And because its Products are always discounted, the Reference Prices do not actually represent regular or former prices, prevailing prices, or the true market values for Defendant's Products.

50.     In fact, they represent nothing more than fictitious prices designed to mislead consumers into making purchases they would not otherwise make and/or to pay higher prices they would not otherwise pay.

51.     Had Defendant marketed its products truthfully, consumers would not have purchased the Products or would done so only at lower, legitimately discounted price points.

***Embark's Reference Prices Were Not Prevailing Market Prices***

52.     Embark is the manufacturer of the Products and the vast majority of the Products

are sold by Defendant directly to consumers (at purportedly discounted prices) through its web-site. In addition to selling its Products through its own website, Defendant sells them through third-party websites such as Amazon.com.

53.   When a consumer searches for Defendant's Products on the internet, they will first find Defendant's website, then third-party websites where its Products are listed for sale. For example, when Plaintiff's counsel searched on Google.com for "Embark dog DNA test," the first two results directed consumers to Defendant's website, the third result directed consumers to its Breed & Health Kit listing on Amazon.com (where Defendant is identified as "Embark Store" and is the seller of its Products), and results four through six also directed consumers to Defend-ant's website.

54.   As the primary seller of the Products through its own and third-party websites, Defendant sets the prevailing market price for them: most sales are automatically made at De-fendant's advertised prices because Defendant is the one making the sales through these web-sites.

55.   Further, to the extent that any third-party websites are resellers of Defendant's Products, they never sell the Products for more than Defendant's "discounted" prices let alone at its Reference Prices. As such, Defendant's Reference Prices also cannot be construed as com-parison prices.

56.   Based on information and belief, the prices listed by Defendant for its Products on Amazon.com always match the purportedly discounted prices advertised on its own website. For example, www.camelcamelcamel.com tracks price histories for products sold through Ama-zon.com, including those Products sold by Defendant. These price histories show that Embark's Breed + Health DNA Test has never been sold through Amazon for more than $159 since ap-proximately November 2020, and its Breed Identification Test has never been sold through Am-azon for more than $109 since approximately October 2021. In short, the prices for Defendant's Products on Amazon.com continuously track the falsely discounted prices advertised on Defend-ant's website. Example screen captures are provided below:

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Screen captured on October 9, 2024.

25
26  ///
27  ///
28  ///

CLASS ACTION COMPLAINT



**Embark Breed Identification Kit - Most Accurate Dog DNA Testing Kit - 99% Breed Ancestry Accuracy for Mixed Breed Dogs - Plus Relative Finder & Family Tree**

**ASIN:** B07HHF1VLH   •   **UPC:** 857902006100   •   **EAN:** 085790200610   •   **PRODUCT GROUP:** Pet Products   •
**CATEGORY:** Target   •   **MANUFACTURER:** Embark Veterinary   •   **MODEL:** DNB301



**Amazon Price History**

This is our record of Amazon price changes for **Embark Breed Identification Kit - Most Accurate Dog DNA Testing Kit - 99% Breed Ancestry Accuracy for Mixed Breed Dogs - Plus Relative Finder & Family Tree (B07HHF1VLH)** since we began monitoring it on Oct 11, 2018.

| Price Type | Lowest Ever | Highest Ever | Current + | Average |
|---|---|---|---|---|
| Amazon | - | - | - | - |
| 3rd Party New | $89.00 (Nov 09, 2021) | $129.00 (Nov 29, 2019) | $95.00 (Oct 08, 2024) | $103.98 |
| 3rd Party Used | - | - | - | - |

camelcamelcamel monitors individual product prices across three Price Types: Amazon, Third Party New, and Third Party Used. "Amazon" means the price of an item Sold By and Shipped By Amazon itself; the two Third Party price types refer to third party prices on Amazon in New or Used condition, usually by marketplace sellers.

Screen captured on October 9, 2024.

57.    For example, Defendant lists for sale on Amazon.com its Breed & Health Kit for $159.00 (marked down from a struck-out Reference Price of $199.00, Purebred Kit for $159.00 (marked down from $199.00), Dog Age Test Kit for $129.00 (marked down from $159.00), and

19

Breed + Health Dog DNA Test & Dog Age Test Bundle  for $268 (marked down from $358).

Example screen captures are provided below:



Screen captured on September 27, 2024.



Screen captured on September 28, 2024.

CLASS ACTION COMPLAINT

1



2

3

4

5

6

7

8

9

10

11

12                              Screen captured on September 28, 2024.

13

14

15

16



17

18

19

20

21

22

23                              Screen captured on September 28, 2024.

24        58.     These are the same purported discounts and Reference Prices that—aside from

25 steeper discounts sometimes advertised during actually time-limited sales—have been continu-

26 ously advertised on Embark's website. *See above*, at ¶ 29.

27       59.     In short, since Defendant is the primary seller of its Products, they are most com-

28 monly sold for the purportedly discounted prices that it advertises but are, in reality, always

available from Defendant (across all of Defendant's sales channels); and by artificially inflating the demand for its Products through false and misleading advertising practices, its Products command higher prices across than they otherwise could.

### *Embark Offers Fake Coupons*

60.     When not offering larger-than-normal, time-limited discounts, Defendant's website advertises that customers could "[s]ave up to $40 with code BESTDOG!" Then, each product is identified with a picture, name, description, and purportedly discounted price listed in bold next to a struck-out Reference Price. Depending on the Product, the purported discount varied from $10.00 to $40.00.



Screen captured on September 10, 2024.

61.     But the "BESTDOG" coupon is not a real coupon. It is not limited in any way, such as for first-time purchases, limited-time purchases, or a limited number of purchases. When multiple Products are added to a customer's cart, the coupon is fully and separately applied to each Product selected for purchase. After a customer completes a purchase, the same coupon will still apply to any subsequent purchases.

1

2

3

4

5

6

7



Screen captured on September 10, 2024.

8      62.    Nor must customers take any steps to find or use the coupon. The coupon is auto-

9 matically applied to every customer's cart and can only *not* be used if deliberately deleted from

10 their cart. In other words, customers would not only have to volunteer to pay extra for the same

11 Products but also take an extra step to do so.

12

13

14

15

16

17

18

19

Screen captured on September 10, 2024.

20      63.    However, this coupon is meaningless. Based on Plaintiff's counsel's investigation

21 using the Wayback Machine, Defendant has advertised the "BESTDOG" coupon since at least

22 January 22, 2023. Since that date, this coupon has been synonymous with the highest price ever

23 charged for Defendant's Products and the smallest discount Defendant ever advertises for its

24 Products. The coupon is only ever not advertised for brief periods of time when Defendant ad-

25 vertises slightly larger, limited time discounts, after which Product prices revert back to the base-

26 line created by this coupon.

27      64.    Put differently, the "BESTDOG" coupon is an automatically applied, persistent,

28 and Product-wide permanent discount.

*Embark's Advertisements Violate California Law*

65.     California's False Advertising Law ("FAL") prohibits any business from making statements concerning its products or services that it knows or should know to be untrue or misleading. *See* Cal. Bus. & Prof. Code § 17500. This prohibition includes false or misleading statements suggesting that a product is discounted from a bona fide former price when, in reality, the former price is a fictitious one. *See e.g.*, Cal. Bus. & Prof. Code § 17501 ("No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price [. . .] within three months.").

66.     Further, California's Consumer Legal Remedies Act ("CLRA") prohibits "advertising goods or services with the intent not to sell them as advertised" while specifically prohibiting "false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code § 1770(a)(9), (13).

67.     California's Unfair Competition Law ("UCL") generally outlaws "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

68.     Moreover, the Federal Trade Commission's regulations on pricing confirm that Defendant's scheme is unfair and deceptive. Their regulations prohibit false or misleading "former price comparisons," for example, making up "an artificial, inflated price ... for the purpose of enabling the subsequent offer of a large reduction" off that price. 16 C.F.R. § 233.1. They also prohibit false or misleading "retail price comparisons" that falsely suggest that the seller is "offer[ing] goods at prices lower than those being charged by others for the same merchandise" when this is not the case. 16 C.F.R. § 233.1.

69.     As detailed above, Defendant made false and misleading statements about its Reference Prices. Specifically, Defendant continuously advertised its Products as being sold at discounts from Reference Prices masquerading as former prices. However, these Reference Prices were not the prevailing market prices for Defendant's Products at any time during the three months preceding publication of their advertisement. Thus, they were not bona fide former prices.

70.     When Defendant advertises additional "steeper" discounts, generally for specified

limited time periods, it does not reference the latest prevailing prices actually paid for Products, but rather the inflated Reference Prices that are never actually paid by customers. And when these brief sales end, the Product Prices do not revert back to the Reference Prices, but rather the baseline prices created by Defendant's continuous coupons.

71.    As such, Defendant continuously advertised its Products with the intent not to sell them as advertised; for example, by advertising goods as possessing bona fide former prices and/or market values with the intent to sell goods that never actually commanded those former prices and/or market values.

72.    Further, Defendant's false reference pricing scheme is patently unfair and deceptive. As described above, Defendant advertises fake discounts with false Reference Prices, which induces consumers to purchase its Products and causes them to pay higher prices, resulting in substantial economic injury. But, as explained above, the Products are never sold at their purported Reference Prices, so the advertised discounts are illusory.

73.    Reasonable consumers who rely on Defendant to provide accurate and truthful representations about their prices cannot reasonably avoid this injury. Defendant's false discounts offer no countervailing benefits—misrepresenting the Products' prices solely benefits Defendants while harming consumers and honest competitors alike.

74.    As such, Defendant's business practices are unfair, deceptive, false, and misleading, in violation of California's laws.

### *Embark's Fake Discounts Harm Consumers*

75.    Based on Defendant's false representations, reasonable consumers expect that Defendant's struck-out Reference Prices represent former prices at which its Products were sold in recent history, are the prevailing prices for the Products, and are the true market value of the Products.

76.    Reasonable consumers also expect that if they purchase the Products at the advertised discounts, then they will receive—at a discount—Products whose market value is the referenced, non-discounted price. For example, for items that are purportedly marked down to $159.00 from $199.00, reasonable consumers would expect that they are receiving a $40.00

discount off of a bona fide former price and that the items have a market value that is $40.00 greater than what they are spending.

77.     But Plaintiff's and Class Members' reasonable expectations have *not* been met. Instead of receiving Products with a market values equal to the alleged Reference Prices, they received items worth less. Instead of receiving significant discounts, Plaintiff and Class Members received little or no discounts.

78.     Further yet, Plaintiff and Class Members paid higher prices than they would have paid for Defendant's Products but for its false and misleading advertisements.

79.     Thus, Defendant's illegal advertisements harm consumers by depriving them of the reasonable expectations to which they are entitled.

80.     Defendant engages in this illegal business practice because consumers are more likely to buy a product, and buy more of it, if they believe that the product is actually discounted such that they stand to gain a product with a higher regular price and/or market value than what they paid for it.

81.     Defendant is incentivized to engage in this duplicitous conduct because consumers who are presented with discounts are substantially more likely to make purchases: "[n]early two-thirds of consumers surveyed admitted that a promotion or a coupon often closes the deal, if they are wavering or are undecided on making a purchase,"[5] while, "two-thirds of consumers have made a purchase they weren't originally planning to make solely based on finding a coupon or discount," and "80% [of consumers] said they feel encouraged to make a first-time purchase with a brand that is new to them if they found an offer or discount."[6]

82.     Similarly, when consumers believe that an offer is expiring soon, the sense of urgency makes them more likely to buy a product and less likely to comparison shop or purchase

---

[5] https://www.invespcro.com/blog/how-discounts-affect-online-consumer-buying-behavior/
[6] RetailMeNot Survey: Deals and Promotional Offers Drive Incremental Purchases Online, Especially Among Millennial Buyers (prnewswire.com)

CLASS ACTION COMPLAINT

1 from another retailer.[7]

2     83.   Defendant's advertisements harm consumers by inducing them, based on false

3 and/or misleading information, to make purchases they otherwise would not have made. De-

4 fendant's false advertisements also artificially increase consumer demand for Defendant's Prod-

5 ucts, which creates upward pressure on the prices that Defendant can charge for its Products. As

6 a result, Defendant can charge a price premium for its Products across all its sales channels,

7 which it would not be able to charge absent the misrepresentations described above.

8     84.   Research "suggest[s] that consumers are likely to be misled into a willingness to

9 pay a higher price for a product simply because the product has a higher reference price." *An*

10 *investigation into the effects of Advertised Reference Prices on the Price Consumers are Willing*

11 *to Pay for the Product*, *supra*, at p. 66. One study showed that "on average, consumers were

12 willing to pay $178.60 for the product with a $289 reference price" but "were willing to pay

13 $250.80 for the identical product with a $429.00 reference price." *Id.*

14               ***Plaintiff Was Misled by Embark's Advertisements***

15     85.   On August 12, 2024, Plaintiff Li Pi purchased an Embark Breed + Health Test from

16 Defendant's website, www.embarkvet.com. He made this purchase while living in Palo Alto, Cal-

17 ifornia.

18     86.   On July 16, 2024, Defendant's most recently archived webpage showed that the

19 Breed + Health DNA Test was listed for sale and purportedly discounted from $199 to $159.

---

[7] https://cxl.com/blog/creating-urgency/ (addition of a countdown timer increased conversion rates from 3.4%-10%); Dynamic email content leads to 400% increase in conversions for Black Friday email | Adestra (uplandsoftware.com) (400% higher conversation rate for ad with countdown timer); *see also* Dhruv Grewal & Larry D. Compeau, Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue, J. Public Policy & Marketing 18, no. 1, p. 7 (1999).



87.    Consistent with this, Mr. Pi's online shopping cart at the time of checkout represented that the regular price of the Breed + Health Kit was $199.00, with "$199.00" struck out, and that he was receiving a discount of $40.00, for a final discounted price of $159.00. After making his purchase, he received an invoice from Defendant via email indicating that he used the discount code "BESTDOG" and paid $159.00. However, this emailed invoice inexplicably listed the discount associated with the code as $0.00, even though the final price he paid was $40.00 less than the advertised Reference Price. See below:



Received by Plaintiff Li Pi on August 12, 2024.

28

88.     Prior to making this purchase, Defendant advertised that the Product had a certain regular price and that Mr. Pi would be receiving a substantial discount from that price by using the provided discount code. However, this discount was illusory, as Defendant has never actually sold the Product for more than $159.00 since at least November 2020.

89.     Mr. Pi read and relied on the representations made by Defendant on its website, online shopping cart, and email confirmation, including that the Product was being offered at a discount off of a higher regular price (i.e., the Reference Price). Mr. Pi understood this to mean that Defendant would charge the Reference Price for the Product again soon, so he would only receive the advertised price reduction by buying immediately or during a short window of time.

90.     Based on Defendant's representations described and shown above, Mr. Pi reasonably believed that the Product he was purchasing was regularly offered for sale at the published Reference Price (before the promotion Defendant was advertising); that this Reference Price was the market value of the Product that he was buying; that he was receiving the advertised discount and a price reduction off of the regular price, and that the advertised discount was only available for a limited time. He would not have made this purchase if he had known that the Product was not discounted as advertised and that he was not receiving the advertised discount.

### *No Adequate Remedy at Law*

91.     Legal remedies are inadequate because they would not prevent Defendant from continuing to engage in the unfair and deceptive advertising practices described above. Plaintiff would consider purchasing Embark's Products from Defendant again in the future if he could reasonably believe that Defendant's Reference Prices accurately reflect its regular and former prices, and that the market value of its Products and discounts were truthful.

92.     Without an injunction, Plaintiff and Class Members have no realistic way of knowing which—if any—of Defendant's Reference Prices, purported discounts, and supposedly time-limited sales are not false or deceptive. Accordingly, Plaintiff and Class Members are unable to rely on Defendant's advertising in the future, and so cannot purchase the Products they would otherwise consider purchasing from Defendant in the future. Thus, Plaintiff and Class Members face an imminent threat of future harm without an injunction.

1

## CLASS ACTION ALLEGATIONS

2     93.     Plaintiff brings this action on behalf of himself and as a class action on behalf of

3   the following defined Class:

4        • All persons who, while in the state of California and within the applicable statute of

5          limitations period, purchased directly from Defendant's website one or more Products

6          advertised at a discount on Defendant's website.

7     94.     **Numerosity and Ascertainability.** The proposed Class contains members so

8   numerous that a separate joinder of each member of the class is impractical. There are thousands

9   or perhaps even tens of thousands of class members, each of whom can be identified through

10   Defendant's sales records and/or public notice.

11     95.     **Existence and Predominance of Common Issues.** Common questions of

12   law and fact exist as to all Class Members, which predominate over issues affecting individual

13   Class Members, including, but not limited to:

14        a.     Whether Defendant advertised false Reference Prices on its website and falsely ad-

15   vertised discounts to the prices for Products sold on its website;

16        b.     Whether the purported discounts advertised by Defendant reflected any actual dis-

17   counts or savings;

18        c.     Whether Defendant made any other false or misleading statements of fact in its

19   advertisements;

20        d.     Whether Plaintiff and Class Members reasonably relied on Defendant's false or

21   misleading advertisements when purchasing its Products;

22        e.     Whether Defendant's conduct constitutes violations of California's False Advertis-

23   ing Law, Consumer Legal Remedies Act, and/or Unfair Competition Law;

24        f.     Whether Defendant's conduct constitutes violation any other federal and/or Cali-

25   fornia pricing regulations; and

26        g.     Whether Plaintiff and Class Members sustained damage as a result of any of the

27   aforementioned violations, and, if so, the proper measure of their damages, including interest,

28   penalties, costs, attorneys' fees, and equitable relief.

96.   **Typicality.** Plaintiff's claims are typical of the proposed Class. Plaintiff, like all other Class Members, purchased one or more qualifying Products from Defendant that were advertised on it's website as being discounted from Reference Prices that were not the prevailing prices for the Products.

97.   **Adequacy.** There are no material conflicts of interest between Plaintiff and the proposed Class that would make class certification inappropriate. Plaintiff will fairly and adequately protect the interests of the proposed Class, and he understands his obligation to inform the Court of any relationships, conflicts, or differences with any Class Member(s). Moreover, Plaintiff has retained competent attorneys as proposed class counsel, who are well-versed in the rules governing class action discovery, certification, and settlement, and who will vigorously assert the claims of all Class Members.

98.   **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this dispute. The damages incurred by individual Class Members, while significant, are small in comparison to the burden and expense of individualized litigation over Defendant's conduct. Further, the court system would be overwhelmed by individual lawsuits if all Class Members separately sought redress. Such individualized litigation increases the delay and expense to all parties, and to the court system, due to the complex legal and factual issues of this case.

99.   Individualized litigation also creates the potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

100.   Plaintiff contemplates providing individual notice to all members of the Class defined above as identified through Defendant's records.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## Violation of California's False Advertising Law

### *Bus. & Prof. Code §§ 17500, et seq.*

### (On Behalf of Plaintiff and the Class)

101.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

102.   Plaintiff brings this cause of action on behalf of himself and all members of the Class.

103.   Bus. & Prof. Code § 17500 provides that "[i]t is unlawful [. . .] with intent directly or indirectly to dispose of real or personal property [. . .] to make or disseminate [. . .] any advertising device [. . .] which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or [. . .] with the intent not to sell that personal property [. . .] so advertised at the price stated therein, or as so advertised."

104.   Bus. & Prof. Code § 17501 further provides: "No price shall be advertised as a former price of any advertised thing, *unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding* the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." (emphasis added).

105.   As alleged more fully above, Defendant advertises purported former prices on its website along with purported discounts. Defendant does this by listing and crossing out a higher Reference Price (e.g., ~~$199~~) and displaying it next to a purportedly discounted price (e.g., $159).

106.   Plaintiff and Class Members reasonably understood the stricken price to be the prevailing price for the product and that absent the sale or discount the product would and will be continue to be sold at that price.

107.   However, unbeknownst to the Class, the prices advertised by Defendant as former prices (i.e., Reference Prices) were not the prevailing prices for its Products. Nor do Defendant's advertisements indicate whether or when the purported former prices were ever actually offered

because they were never offered for sale for the stated price but only at various discounted prices.

108.    Defendant's representations about the former prices of its Products are untrue and misleading.

109.    This practice of advertising Products at continuously discounted prices alongside struck-out Reference Prices, which are materially greater than the true prevailing prices for Products, constitutes an untrue and misleading advertising practice in violation of California's False Advertising Law.

110.    As a result, Defendant violated, and continues to violate, Sections 17500 and 17501 to induce Plaintiff and Class Members to make purchases on its website based on the advertised former prices.

111.    Defendant's misrepresentations were intended to induce reliance and were material to the decision by a reasonable consumer in making a purchase. Plaintiff saw, read, and reasonably relied on them when purchasing Defendant's Products. Defendant's misrepresentations were a substantial factor in Plaintiff's decision to purchase the Products.

112.    In addition, Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy the Products.

113.    Plaintiff and Class Members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Products if they had known the truth, (b) they overpaid for the Products because the Products were sold at a price premium due to the misrepresentation, and/or (c) they did not receive the discounts they were promised, and instead received Products with market values lower than the promised market values.

114.    Defendant's acts or omissions are further injurious to the public interest because these practices were committed in the course of its business and have been committed repeatedly, both before and after Plaintiff purchased the Products. They are part of a pattern of false, misleading, and unfair advertising practices. These actions have injured other persons and, if continued, have the capacity to injure yet more persons.

**SECOND CAUSE OF ACTION**

**Violation of California's Consumer Legal Remedies Act**

***Cal. Civ. Code §§ 1750, et seq.***

**(On Behalf of Plaintiff and the Class)**

115.    Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

116.    Plaintiff brings this cause of action on behalf of himself and all members of the Class.

117.    Plaintiff and Class Members are "consumers" as that term is defined by Cal. Civ. Code § 1761(d). "'Consumer' means an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." *Id*.

118.    Plaintiff and Class Members have engaged in "transactions" with Defendant as that term is defined by Cal. Civil Code § 1761(e). "'Transaction' means an agreement between a consumer and another person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." *Id*.

119.    Plaintiff and Class Members purchased "goods" from Defendant as that term is defined by Cal. Civil Code § 1761(a). "'Goods' means tangible chattels bought or leased for use primarily for personal, family, or household purposes [. . .]" *Id*.

120.    Defendant violated, and continues to violate, numerous provisions of Section 1770(a) of the California Civil Code.

121.    Defendant violated, and continues to violate, Section 1770(a)(5) of the California Civil Code by representing that Products offered for sale on its website have characteristics or benefits that they do not have. Specifically, Defendant represents that the value of its Products is greater than in reality by advertising inflated Reference Prices for the sole purpose of enabling subsequent offers of large reductions from those prices.

122.    Defendant violated, and continues to violate, Section 1770(a)(9) of the California Civil Code by advertising its Products as being offered at a discount, when in fact Defendant does not intend to sell the Products at a discount.

123.   Finally, Defendant violated, and continues to violate, section 1770(a)(13) by making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions on its website, including by (1) misrepresenting the regular price of Products on its website, (2) advertising discounts and savings that are exaggerated or nonexistent, and/or (3) misrepresenting that the discounts and savings are unusually large, when in fact they are regularly available.

124.   Defendant's representations were likely to deceive, and did deceive, Plaintiff and other reasonable consumers who are members of the proposed Class. Defendant knew or should have known, through the exercise of reasonable care, that these statements were untrue and misleading.

125.   Defendant's misrepresentations were intended to induce reliance, and Plaintiff saw, read, and reasonably did rely on them when purchasing Defendant's Products. Defendant's misrepresentations were a substantial factor in each Plaintiff's decision to purchase the Products.

126.   In addition, Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy the Products.

127.   Plaintiff and Class Members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Products if they had known the truth, (b) they overpaid for the Products because the Products were sold at a price premium due to the misrepresentation, and/or (c) they did not receive the discounts they were promised, and instead received Products with market values lower than the promised market values.

128.   Defendant's acts or omissions are further injurious to the public interest because these practices were committed in the course of its business and have been committed repeatedly, both before and after Plaintiff purchased the Products. They are part of a pattern of false, misleading, and unfair advertising practices. These actions have injured other persons and, if continued, have the capacity to injure yet more persons.

129.   Plaintiff seeks damages and, alternatively, restitution. Plaintiff is permitted to seek

equitable remedies in the alternative because he has no adequate remedy at law. A legal remedy is not adequate if it is less certain than an equitable remedy. The elements of Plaintiff's equitable claims are different than and do not require the same showings as Plaintiff's legal claims. For example, to obtain damages under the CLRA, a plaintiff must show that they complied with the CLRA's notice requirement to obtain damages. No such requirements exist to obtain restitution. Because a plaintiff must make this additional showing to obtain damages, unlike for restitution, the legal remedies are more uncertain.

130.    Plaintiff also seeks an injunction. Legal remedies are inadequate because they would not prevent Defendant from continuing to engage in the unfair and deceptive practices described above. Plaintiff and Class Members face an imminent threat of future harm. Plaintiff would consider purchasing Embark's Products from Defendant again in the future if he could reasonably believe that Defendant's Reference Prices accurately reflect its regular and former prices, and that the market value of its Products and discounts were truthful. Without an injunction, Plaintiff and Class Members have no realistic way to know which—if any—of Defendant's Reference Prices, discounts, and sales are not false or deceptive. Accordingly, Plaintiff and Class Members are unable to rely on Defendant's advertising in the future, and so cannot purchase the Products they would otherwise consider purchasing from Defendant in the future.

131.    Finally, the remedies at law available to Plaintiff and Class Members are not equally prompt or otherwise efficient. The need to schedule a jury trial may result in delay, and a jury trial would take longer and be more costly than a bench trial.

132.    Accordingly, pursuant to California Civil Code § 1780(a)(2), Plaintiff, on behalf of himself and all other members of the Class, seeks injunctive relief.

133.    CLRA § 1782 NOTICE. On October 22, 2024, a CLRA demand letter was sent to Defendant's Boston headquarters via certified mail (return receipt requested), which provided notice of Defendant's violations of the CLRA and demanded that Defendant correct the unlawful, unfair, false, and/or deceptive practices complained of herein. Defendant does not have a principal place of business in California. However, a copy of this CLRA demand letter was also sent to its registered corporate agent in California, C T Corporation System, via certified mail (return

receipt requested) on October 22, 2024. If Defendant does not fully correct or agree to fully correct the problems alleged by Plaintiff and for each member of the proposed Class within 30 days of receipt, then Plaintiff will seek all monetary relief allowed under the CLRA, including actual, punitive, and statutory damages, as appropriate.

134.    A declaration of venue pursuant to Cal. Civ. Code § 1780(d) is filed concurrently with the filing of this complaint.

**THIRD CAUSE OF ACTION**

**Violation of California's Unfair Competition Law**

***Bus. & Prof. Code §§ 17200, et seq.)***

**(On Behalf of Plaintiff and the Class)**

135.    Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

136.    Plaintiff brings this cause of action on behalf of himself and all members of the Class.

137.    Defendant has violated California's Unfair Competition Law (UCL) by engaging in unlawful, fraudulent, and unfair conduct (i.e., violating each of the three prongs of the UCL).

***The "Unlawful" Prong***

138.    Defendant engaged in unlawful conduct by violating the FAL and CLRA, as alleged above and incorporated herein. In addition, Defendant engaged in unlawful conduct by violating the FTCA. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" and prohibits the dissemination of false advertisements. 15 U.S.C. § 45(a)(1), 15 U.S.C. § 52(a). As the FTC's regulations make clear, Defendant's false referencing pricing scheme violates the FTCA. 16 C.F.R. § 233.1, § 233.2.

***The "Deceptive" or "Fraudulent" Prong***

139.    As alleged in detail above, Defendant's representations that its Products were discounted, that its Reference Prices represented former or prevailing prices for the Products, that customers were receiving true discounts in the amounts advertised, and that customers were receiving goods with market values equivalent to the Reference Prices were false and misleading.

140.    Defendant's representations were likely to deceive, and did deceive, Plaintiff and other reasonable consumers who are members of the proposed Class. Defendant knew or should have known, through the exercise of reasonable care, that these statements were untrue and misleading.

### The "Unfair" Prong

141.    As alleged in detail above, Defendant committed "unfair" acts by falsely advertising that its Products were discounted, that its Reference Prices represented former or prevailing prices for the Products, that customers were receiving true discounts in the amounts advertised, and that customers were receiving goods with market values equivalent to the Reference Prices, when none of this was true.

142.    Defendant violated established public policy by violating the CLRA, the FAL, and the FTCA, as alleged above and incorporated here. The unfairness of this practice is tethered to a legislatively declared policy (that of the CLRA and FAL).

143.    These unfair acts caused Plaintiff and members of the proposed Class to make purchases they otherwise would not have made, pay more for their purchases, and/or be deprived of their expectancy interest in receiving the Products as advertised.

144.    The harm to Plaintiff and members of the proposed Class greatly outweighs any public utility of Defendant's conduct. Their injuries were not outweighed by any countervailing benefits to consumers or competition, as there is no public utility to misrepresenting the prices of Products to consumers. There were reasonably available alternatives to further Defendant's legitimate business interests other than the misleading and deceptive conduct described herein.

### The Class Was Harmed

145.    For each prong, Defendant's misrepresentations were intended to induce reliance, and Plaintiff saw, read, and reasonably did rely on them when purchasing Defendant's Products. Defendant's misrepresentations were a substantial factor in each Plaintiff's decision to purchase the Products.

146.    Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy

the Products.

147.    Plaintiff and Class Members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Products if they had known the truth, (b) they overpaid for the Products because the Products were sold at a price premium due to the misrepresentation, and/or (c) they did not receive the discounts they were promised, and instead received Products with market values lower than the promised market values.

148.    Defendant's acts or omissions are further injurious to the public interest because these practices were committed in the course of its business and have been committed repeatedly, both before and after Plaintiff purchased the Products. They are part of a pattern of false, misleading, and unfair advertising practices. These actions have injured other persons and, if continued, have the capacity to injure yet more persons.

149.    Plaintiff seeks damages and, alternatively, restitution. Plaintiff is permitted to seek equitable remedies in the alternative because he has no adequate remedy at law. A legal remedy is not adequate if it is less certain than an equitable remedy. The elements of Plaintiff's equitable claims are different than and do not require the same showings as Plaintiff's legal claims. For example, to obtain damages under the CLRA, a plaintiff must show that they complied with the CLRA's notice requirement to obtain damages. No such requirements exist to obtain restitution. Because a plaintiff must make this additional showing to obtain damages, unlike for restitution, the legal remedies are more uncertain.

150.    Plaintiff also seeks an injunction. Legal remedies are inadequate because they would not prevent Defendant from continuing to engage in the unfair and deceptive practices described above. Plaintiff and Class Members face an imminent threat of future harm. Plaintiff would consider purchasing Embark's Products from Defendant again in the future if they could reasonably believe that Defendant's Reference Prices accurately reflect its regular and former prices, and that the market value of its Products and discounts were truthful. Without an injunction, Plaintiff and Class Members have no realistic way to know which—if any—of Defendant's Reference Prices, discounts, and sales are not false or deceptive. Accordingly, Plaintiff and Class Members are unable to rely on Defendant's advertising in the future, and so cannot purchase the

1  Products they would otherwise consider purchasing from Defendant in the future.

2      151.    Finally, the remedies at law available to Plaintiff and Class Members are not

3  equally prompt or otherwise efficient. The need to schedule a jury trial may result in delay, and

4  a jury trial would take longer and be more costly than a bench trial.

5  **DEMAND FOR JURY TRIAL**

6      Plaintiff demands a trial by jury on all issues so triable.

7  **PRAYER FOR RELIEF**

8      WHEREFORE, Plaintiff respectfully prays for judgment as follows:

9      A.    For an Order:

10         a.  Certifying the Class;

11         b.  Appointing Plaintiff as representatives of the Class;

12         c.  Appointing Plaintiff's counsel as Class Counsel;

13     B.    For actual and liquidated damages according to proof at trial;

14     C.    For statutory and civil penalties and special damages, according to proof at trial;

15     D.    For pre- and post-judgment interest on monetary damages;

16     E.    For preliminary and permanent injunctive relief;

17     F.    For reasonable attorneys' fees and costs and expert fees and costs as allowed by

18 law; and

19     G.    For such other relief as this Court deems just and proper

20

21 Dated:      October 22, 2024            Respectfully submitted,

22                                       **KING & SIEGEL LLP**

23                                       By: _____

24                                       Brent Boos, Esq.

25                                       Elliot Siegel, Esq.

                                      Attorneys for Plaintiff and the Putative Class

26

27

28

CLASS ACTION COMPLAINT